**Ernest S. BORUM, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 20270.**

United States Court of Appeals District of Columbia Circuit.

Argued June 26, 1967.

Decided Dec. 21, 1967.

Petitions for Rehearing En Banc and before the Division Denied Feb. 14, 1969.

Certiorari Denied May 19, 1969. See 89 S.Ct. 1765.

434

Mr. Howard C. Westwood, Washington, D. C. (appointed by this court), for appellant.

Mr. Henry K. Osterman, Special Attorney to the United States Attorney, of the bar of the Court of Appeals of New York, *pro hac vice*, by special leave of court, with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker and Joel D. Blackwell, Asst. U. S. Attys., were on the brief, for appellee.

Before FAHY, Senior Circuit Judge, and TAMM and ROBINSON, Circuit Judges.

SPOTTSWOOD ROBINSON, III, Circuit Judge:

On the morning of June 14, 1965, a male intruder entered a residence and stunned an 80-year old occupant by inflicting a number of blows with a pistol. Somewhat later, a laundryman making a call was confronted by the intruder who at gunpoint took $285 from him, and left him bound and gagged in a bedroom. Shortly thereafter, a female neighbor came into the house, whereupon the intruder, pistol in hand, allegedly forced her to undress and submit to sexual intercourse with him.

As soon as the intruder left, the rape complainant reported these occurrences. Two articles taken for examination during an immediate police investigation of the premises contained fingerprints matching appellant's.[1] This led to his arrest on July 6, and an ensuing lineup at which the rape complainant identified him as her assailant.

Appellant was placed on trial on an eight-count indictment, and the rape complainant identified him again.[2] The jury, against his showing on alibi, found him guilty on six counts,[3] on each of which a sentence of imprisonment was imposed. His appeal counsel tenders for our consideration three questions, ably briefed and argued, which we find need to discuss.[4] We affirm the conviction but remand the case with a direction as to the sentences.

I

When appellant surrendered to the police, his trial attorney, who accompanied him, requested that she be informed as to when a lineup would be held, leaving her card for this purpose and stating her desire to be present. Appellant testified that he had apprehensions about the lineup and wanted his counsel there as a safeguard against the unfairness of any identification. But without notice to counsel and in her absence, appellant was placed in a lineup and identified by the rape complainant. And at the trial the complainant not only again identified appellant in the courtroom, but also testified to her prior identification at the lineup.

█ Appellant asserted prejudice of constitutional dimension as a consequence of the lineup conducted in the absence of his attorney, but it is clear that the contention so postulated must be rejected. In United States v. Wade[5] and Gilbert v. State of California,[6] decided while this appeal was pending, the Supreme Court held that a lineup is a critical stage in the criminal proceeding at

1. See note 4, *infra.*

2. Neither the occupant of the house nor the laundryman was able to make an identification.

3. Assault with a dangerous weapon (three counts), housebreaking, robbery and rape. D.C.Code §§ 22–505, 22–1801, 22–2801, 22–2901 (1967 ed.). The sentences are set forth in note 26, *infra.*

4. A fourth problem may be speedily solved. Appellant's arrest followed correspondence of fingerprints on two articles in the residence with appellant's prints on file with the police. The latter were obtained in 1960 upon appellant's arrest for an offense for which he was committed, and in 1964 was unconditionally released, under provisions of the Federal Youth Corrections Act, 64 Stat. 1085 (1950), as amended, 18 U.S.C. §§ 5005 to 5026.

The prints found at the scene, together with new prints of appellant taken upon his arrest in this case, were introduced into evidence at the trial. In his opening brief he argued that, as legal consequences of these circumstances, the arrest was illegal and the admission of the prints was erroneous, but prior to oral argument the matter was put to rest by our decision in Stevenson & Borum v. United States, 127 U.S.App.D.C. 43, 380 F.2d 590 (1967) rejecting an identical claim by this appellant. And we are not here presented with the questions posed in Borum v. United States, 127 U.S.App. D.C. 48, 380 F.2d 595 (1967).

5. 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

6. 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

which the Sixth Amendment secures the accused's right to assistance of counsel. In Stovall v. Denno,[7] however, the Court declared that this constitutional rule is prospective in its operation, with the result that this litigation remains unaffected by it.[8]

Appellant now urges that we are free to apply retroactively the *Wade-Gilbert* principle, not as a matter of constitutional compulsion, but in the exercise of our supervisory power over the administration of criminal justice in the District of Columbia. He points to the fact that what is involved here is not a claim that he should have been supplied a lawyer for the lineup;[9] rather, he emphasizes that it was his retained counsel who asked for notification of the lineup, and that for some unexplained reason the request was not honored. He suggests that our disposition might be tailored to fit past pretrial confrontations only when they are of that type.

■ We perceive some merit in this contention, and are ourselves concerned over the collapse, albeit unintended, of counsel's arrangements,[10] but there are more powerful considerations on the other side. The factors [11] which render unfeasible a retroactive application of the wholesome doctrine expounded in *Wade* and *Gilbert* operate equally to persuade us against an antithetical use of our supervisory authority. Indeed, our decisions since *Stovall* have consistently observed the non-retroactivity of *Wade* and *Gilbert*,[12] and we think that it was implicit in these holdings that our supervisory powers would not have been wisely exercised by doing otherwise.

■ Nor can we accept appellant's thesis that we might more appropriately confer retroactivity *if it is confined to* situations where the suspect had counsel who sought affirmatively to arrange for attendance at the lineup. We recognize that a dispensation so limited would ordinarily benefit only those who were financially able to engage counsel at or very shortly after arrest, and we are sensitive to the fact that most defendants in criminal cases in this jurisdiction could not have done so.[13] We are unwilling to fashion a rule the practical operation of which would discriminate between two classes of persons distinguishable only on the basis of wealth.[14]

7. 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed. 2d 1199 (1967).

8. See also the cases cited *infra* note 12.

9. See Kennedy v. United States, 122 U.S. App.D.C. 291, 293–296, 353 F.2d 462, 464–467 (1965); Williams v. United States, 120 U.S.App.D.C. 244, 345 F.2d 733, cert. denied 382 U.S. 962, 86 S.Ct. 444, 15 L.Ed.2d 364 (1965).

10. We note, however, that appellant makes no claim that the lineup procedure "was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law," Stovall v. Denno, *supra* note 7, 388 U.S. at 302, 87 S.Ct. at 1972, and the record does not suggest that it was.

11. See Stovall v. Denno, *supra* note 7, 388 U.S. at 296–301, 87 S.Ct. 1967.

12. Wise v. United States, 127 U.S.App. D.C. 279, 383 F.2d 206, 209–210 (1967); Johnson v. United States, No. 20657 D. C.Cir. June 13 (1967); Cunningham v. United States, 129 U.S.App.D.C. 104, 391 F.2d 457 (June 23, 1967); Parker v. United States, 129 U.S.App.D.C. 104, 391 F.2d 457 (Aug. 17, 1967).

13. "Less than 40 percent of the defendants accused of the more serious crimes in the District of Columbia are represented in the trial court by retained counsel. In felony cases in the District Court in fiscal 1965 retained lawyers appeared most frequently in murder, embezzlement, fraud, narcotics, and gambling cases. Although they represented 38 percent of all defendants, they handled only 21 percent of the robbery cases in 1965 and 16 percent of the auto theft cases." Report of the President's Commission on Crime in the District of Columbia 339 (1966). Statistics for misdemeanor cases are unavailable. *Ibid.*

14. See Griffin v. People of the State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Eskridge v. Washington Prison Board, 357 U.S. 214, 78 S.Ct. 1061, 2 L.Ed.2d 1269 (1958); Burns v. Ohio, 360 U.S. 252, 79 S.Ct. 1164, 3 L. Ed.2d 1209 (1959); Smith v. Bennett, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39

## II

The evidence showed that the rape complainant promptly submitted to a medical examination, in the course of which vaginal smears were obtained for testing. A pathologist testified that analysis revealed that the smears contained human spermatozoa. In his charge to the jury, the trial judge instructed that corroboration of the complainant's testimony was essential to a conviction of rape, and that the jury, in ascertaining whether it was, might "consider all the facts and circumstances surrounding the alleged" act, including, among several the judge mentioned, "the medical testimony * * *

as to the presence of spermatozoa in her vagina." [15]

Appellant now argues, however, that the judge erred in telling the jury that, the circumstance quoted might be considered on the issue of corroboration.[16] Reference is made to expert testimony to the effect that the spermatozoa could have been deposited as much as 72 hours before they were found, and to the fact that the complainant was married and living with her husband. We are told that, with this, the discovery was neutral in significance and valueless as confirmation of any part of the complainant's story. And because one can only

(1961); Douglas v. People of State of California, 372 U.S. 353, 83 S.Ct. 874, 9 L.Ed.2d 811 (1963); Lane v. Brown, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (1963); Draper v. Washington, 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963); Rinaldi v. Yeager, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966).

15. The trial judge's full statement on the subject was:

"It is your responsibility as jurors to determine if there are corroborating circumstances which support the testimony of [the complainant]. In determining whether [the complainant's] testimony was in fact corroborated, you may consider all the facts and circumstances surrounding the alleged assault as, for example, whether or not she promptly made a complaint, the medical testimony of her family doctor, the medical testimony of [name omitted], the pathologist, as to the presence of spermatozoa in her vagina, the stipulated testimony that spermatozoa was found on her underclothing, the testimony of [the laundryman] that she was completely nude when viewed by him and while telephoning to the police, any and all other circumstances which appear in the testimony which might tend in your mind to corroborate her statements. It is for you to determine whether these and other items that you may wish to consider are of such corroborative weight and value as to satisfy the legal requirement of corroboration wholly apart from the testimony of [the complainant]."

16. After delivery of the charge and prior to the jury's retirement for deliberation, defense counsel, stating that the "charge was certainly full in the matter of the corroboration of the acts," requested that the jury be further instructed that the identification had to be corroborated also. This did not isolate the error claimed here, see F.R.Crim.P. 30, and while we might disregard the point, we give appellant the benefit of a large doubt as to the applicability of F.R.Crim.P. 52 (b) by considering it.

As to trial counsel's specific objection, we note that the charge on corroboration, see note 15, *supra*, did not mention and did not distinguish between the criminal acts and the identification. As so recently we reiterated, the standard proclaimed in Kidwell v. United States, 38 App.D.C. 566, 573 (1912), "generally requires corroboration of both the *corpus delicti* and the identification of the attacker." Thomas v. United States, 128 U.S.App.D.C. 233, 387 F.2d 191 (May 4, 1967) at 3. See also Franklin v. United States, 117 U.S.App.D.C. 331, 334–335, 330 F.2d 205, 208–209 (1964). This dual requirement, where applicable, contemplates reasonable instructional precision conducive to the jury's understanding as to the need for corroboration as to each. However, error is not assigned here on this account and the facts of this case, hereafter discussed in the text, in our view bring it within the holding in *Thomas*, thus eliminating the need for additional corroboration. The identification here was "based on adequate opportunity to observe," Franklin v. United States, *supra*, 117 U.S.App.D.C. at 335, 330 F.2d at 209, and that there was such an opportunity was corroborated, outside the complainant's statement, in some part directly by independent testimony and in greater measure indirectly by the surrounding circumstances.

assume that the jury, compliably with the instruction, treated this circumstance, it is urged that the affirmative finding of corroboration which the verdict of guilt reflects is suspect.

■■ In rape prosecutions, "corroboration, in the sense that there must be circumstances in proof which tend to support the prosecutrix' story, is required."[17] While the matter of corroboration is initially for the trial court, like any other question as to the legal sufficiency of the evidence to warrant submission of the case to the jury, it is the latter's function to decide whether the standard of corroborative proof has been met.[18] It goes without saying that the trial court must afford the jury proper and adequate guidance to enable that determination.

■ In our view, however, the challenged reference in the charge was not to any extent an abnegation of that responsibility. Certainly, the probative value of this development would have increased greatly had there been proof that the complainant had not, during the 72-hour period prior to the discovery, had sexual relations with anyone other than the intruder. But we think that when the disputed item is examined in the light of other corroborating evidence, the absence of such proof did not eradicate its tendency to in some degree lend credence to the version the complainant related from the witness stand. What we have here is an instance of the familiar phenomenon of a circumstance, ostensibly impartial when seen in isolation, absorbing color when viewed with its surroundings. When what appellant claims is a neutral factor is examined in total evidentiary context, it loses a good deal of its neutrality.

The record discloses an abundance of independent evidence corroborating the complainant. Spermatozoa were found, not only in her vagina, but on her underclothing as well. The occupant of the invaded residence saw the complainant when she entered, and the laundryman heard the complainant's entry and a brief conversation she then had with the intruder.[19] The complainant reported that she had been raped, to the laundryman at the house, and to both her husband and the police by telephone, as soon as the intruder departed. The laundryman, having extricated himself, observed the complainant standing, completely nude, with a telephone in her hand. He said that she was hysterical and the examining physician somewhat later found her to be tense and upset. The testimony of the two people in the house other than the complainant describing their own treatment by the intruder portrays an individual bent on criminality. And the fact that appellant's fingerprints were found at the scene had a more than ample tendency to lend confirmation to the complainant's identification.[20]

There is much else in the record to suggest the complainant's testimonial reliability. No observational deficiencies or handicaps appear, and she had both ample reason and opportunity over a 30-minute period to take a hard look at her

17. Ewing v. United States, 77 U.S.App. D.C. 14, 17, 135 F.2d 633, 636 (1942), cert. denied 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145 (1943). See also Thomas v. United States, *supra* note 16, at 3; Franklin v. United States, *supra* note 16, 117 U.S.App.D.C. at 334–335, 330 F.2d at 208–209; Walker v. United States, 96 U.S.App.D.C. 148, 152, 223 F.2d 613, 617 (1955); McGuinn v. United States, 89 U.S.App.D.C. 197, 198, 191 F.2d 477, 478 (1951); Kidwell v. United States, *supra* note 16, 38 App.D.C. at 572.

18. See Thomas v. United States, *supra* note 16; Franklin v. United States, *supra* note 16, 117 U.S.App.D.C. at 332, 334,

330 F.2d at 206, 208; McGuinn v. United States, *supra* note 17, 89 U.S.App.D.C. at 198, 191 F.2d at 478; Ewing v. United States, *supra* note 17, 77 U.S.App.D.C. at 15, 135 F.2d at 636; Kidwell v. United States, *supra* note 16, 38 App.D.C. at 572.

19. The witness testified that he heard the intruder tell the complainant "All right, this way * * *. Let's go," and the complainant ask "Let's go where?" to which he replied "I am going to have to tie you up."

20. Compare Hughes v. United States, 113 U.S.App.D.C. 127, 129, 306 F.2d 287, 289 (1962).

assailant. The identification, at the trial as well as at the lineup, was positive. There is no indication that she was exhorted to identify him as the culprit, or that she was ambivalent when she undertook to do so. The indicia of emotional instability and motive for falsification are absent, as well as significant impingement upon her credibility or veracity.[21] We recite these events, not to suggest that adequate corroboration from other sources would cure error in an instruction improperly authorizing consideration of a particular item of proof, but to describe the milieu in which the significance of the item was to be gauged.

■ Even where the effort is to prove a fact, rather than less arduously to corroborate testimony, "[t]he competency of a collateral fact to be used as the basis of legitimate argument is not to be determined by the conclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if these may tend, even in a slight degree, to elucidate the inquiry, or to assist, though remotely, to a determination probably founded in truth." [22] As Dean Wigmore has put it, "the general and broad requirement for Relevancy is that the claimed conclusion from the offered fact must be a possible or a probable or a more probable hypothesis, with reference to the possibility of other hypotheses." [23]

We think it clear that no more is required when the call is to place "circumstances in proof which tend to support the prosecutrix's story," [24] and we think

that the circumstance under scrutiny possessed a capability in that direction. It demonstrated that there was an act of sexual intercourse with the complainant within a 72-hour period [25] although, standing alone, it connoted nothing as to with whom or under what conditions. As to the latter it was not needed, for appellant's fingerprints at the scene substantiated the complainant's identification, and other evidence, independent of her testimony, tended to authenticate the claim of rape. Thus, we reiterate, the contested evidentiary item is not to be appraised in isolation, for it was a link in a completely harmonious chain of events which in the aggregate gave strong support to the complainant's testimony in its entirety. Viewed, then, for what it was, it possessed corroborative force, and the trial judge properly told the jury that so it might be considered.

### III

On June 10, 1966, sentences of imprisonment were imposed on each of the six counts upon which appellant had been convicted.[26] The trial judge specified that these sentences were to be executed concurrently. At the time, however, appellant was serving two other sentences consequent upon earlier convictions.[27] The judge did not then state whether the sentences in this case were to operate concurrently with or consecutively to the others.

On June 15, however, the judge recalled appellant and his counsel to the

21. Compare Thomas v. United States, *supra* note 16, at 2–4.

22. Holmes v. Goldsmith, 147 U.S. 150, 164, 13 S.Ct. 288, 292, 37 L.Ed. 118 (1893), quoting Stevenson v. Stewart, 11 Pa. 307, 308–309 (1849). See also Williamson v. United States, 207 U.S. 425, 451, 28 S. Ct. 163, 52 L.Ed. 278 (1908) ; Smith v. United States, 267 F. 665, 668 (8th Cir. 1920).

23. 1 Wigmore, Evidence § 38 (3d ed. 1940).

24. Ewing v. United States, *supra* note 17, 77 U.S.App.D.C. at 17, 135 F.2d at 636.

25. Compare Lyles v. United States, 20 App. D.C. 559, 564 (1902).

26. Appellant was convicted on counts 1 and 4 to 8 of the eight-count indictment. The sentences were 5 to 15 years on count 1 (housebreaking), 2 to 6 years on count 4 (assault with a dangerous weapon), 5 to 15 years on count 5 (robbery), 2 to 6 years on count 6 (assault with a dangerous weapon), 5 to 20 years on count 7 (rape), and 2 to 6 years on count 8 (assault with a dangerous weapon).

27. United States v. Borum, Criminal No. 943–65 (D.D.C.), rev'd 127 U.S.App.D.C. 48, 380 F.2d 595 (1967) ; United States v. Borum, Criminal No. 944–65 (D.D.C.), aff'd 127 U.S.App.D.C. 43, 380 F.2d 590 (1967).

courtroom "to clarify the record" as to this relationship. He stated that he had intended that the June 10 sentences should run consecutively to those appellant was already serving. His commitment order, filed June 15, so provided.

■■■■■■ It was the pronouncement of the sentences on June 10 that constituted the judgment of the court.[28] The order entered June 15 was efficacious only to the extent that it was consistent with the oral pronouncement,[29] or effectuated a modification which the judge was then empowered to make.[30] When appellant was originally sentenced the trial judge might, we assume, have exercised his discretion in the direction of sentences consecutive to those imposed in the earlier cases. But absent a specification of consecutiveness, multiple sentences operate concurrently.[31] This is so whether they are pronounced contemporaneously or at different times, or pertain to the same or different matters.[32] Here there was nothing whatsoever to indicate, when on June 10 the sentences were articulated, that they were not to be operative immediately.

■■■■ The law is well settled, too, that a sentence in all respects legal cannot be increased after service has begun.[33] "[T]he Constitution was designed as much to prevent the criminal from being twice punished for the same offense as from being twice tried for it."[34] As we have had occasion to add, "[i]f appellant's first sentence was lawful a second sentence could not lawfully be imposed which increased it or made it more severe, once he had commenced serving confinement under it."[35] It is conceded that when on June 15 appellant reappeared

28. "The pronouncement of sentence constitutes the judgment of the court. The authority for the execution of the court's sentence is that judgment. The commitment is mere evidence of such authority * * *'" Kennedy v. Reid, 101 U.S.App.D.C. 400, 403, 249 F.2d 492, 495 (1957), quoting Watkins v. Merry, 106 F.2d 360, 361 (10th Cir. 1939). See also Gilliam v. United States, 106 U.S.App.D.C. 103, 105–106, 269 F.2d 770, 772–773 (1959); Rowley v. Welch, 72 App.D.C. 351, 353, 114 F.2d 499, 501 (1940); Downey v. United States, 67 App.D.C. 192, 91 F.2d 223 (1937). We note, too, that "[a] judgment of conviction," which must "be signed by the judge and entered by the clerk," must set forth the "sentence," and that the defendant must be present "at the imposition of sentence." F.R.Crim.P. 32(b), 43.

29. Henley v. Heritage, 337 F.2d 847, 848 (5th Cir. 1964); Cuozzo v. United States, 340 F.2d 303, 304 (5th Cir. 1965); Payne v. Madigan, 274 F.2d 702, 704 (9th Cir. 1960), aff'd by an equally divided court 366 U.S. 761, 81 S.Ct. 1670, 6 L.Ed.2d 853 (1961). See also Kennedy v. Reid, supra note 28.

30. See Gilliam v. United States, Kennedy v. Reid and Downey v. United States, all supra note 28.

31. Henley v. Heritage, supra note 29, 337 F.2d at 848; Hode v. Sanford, 101 F.2d 290, 291 (5th Cir. 1939); Gaddis v. United States, 280 F.2d 334, 336 (6th Cir. 1960); Buie v. King, 137 F.2d 495, 500 (8th Cir. 1943); McNealy v. Johnston, 100 F.2d 280, 282 (9th Cir. 1938); Subas v. Hudspeth, 122 F.2d 85, 87 (10th Cir. 1941). See also United States v. Daugherty, 269 U.S. 360, 363, 46 S.Ct. 156, 70 L.Ed. 309 (1926); Downey v. United States, supra note 28, 67 App.D.C. at 199, 91 F.2d at 230.

32. Compare Engle v. United States, 332 F.2d 88 (6th Cir.), cert. denied 379 U.S. 903, 85 S.Ct. 192, 13 L.Ed.2d 176 (1964), with Mills v. Hunter, 204 F.2d 468 (10th Cir. 1953).

33. Ex parte Lange, 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1873); Tatum v. United States, 114 U.S.App.D.C. 49, 51, 310 F.2d 854, 855 (1962); Campbell v. United States, 103 U.S.App.D.C. 308, 309 n. 3, 258 F.2d 160, 161 n. 3 (1958); Rowley v. Welch, supra note 28, 72 App.D.C. at 353 n. 3, 114 F.2d at 501 n. 3. See also United States v. Benz, 282 U.S. 304, 307–309, 51 S.Ct. 113, 75 L.Ed. 354 (1931); King v. United States, 69 App.D.C. 10, 13–15, 98 F.2d 291, 294–296 (1938). Such is the rule although the increase effectuates an intention undisclosed when the sentences were pronounced. See, e. g., Duggins v. United States, 240 F.2d 479, 482 (6th Cir. 1957).

34. Ex parte Lange, supra note 33, 85 U.S. at 173.

35. Tatum v. United States, supra note 33, 114 U.S.App.D.C. at 50, 310 F.2d at 855.

before the trial judge, judicial custody for purposes of trial had already been transformed into executive custody for execution of the several sentences imposed in this case.[36]   And the trial judge's "clarification" on that date had the necessary effect of increasing the aggregate term of imprisonment appellant was to serve in consequence of those sentences.[37]

We affirm the conviction, but remand the case to the District Court with the direction that the order entered on June 15, 1966, be amended to eliminate the provision purporting to designate consecutiveness in the sentences.

It is so ordered.

36. "The sentence of imprisonment of any person convicted of an offense shall commence to run from the date on which such person is received at the penitentiary, reformatory, or jail for service of such sentence. * * * If any such person shall be committed to a jail or other place of detention to await transportation to the place at which his sentence is to be served, his sentence shall commence to run from the date on which he is received at such jail or other place of detention." 18 U.S.C. § 3568. Thus we may distinguish cases in which at the time of alteration of the sentence the defendant had not left the courtroom, Vincent v. United States, 337 F.2d 891, 893–894 (8th Cir. 1964), cert. denied 380 U.S. 988, 85 S.Ct. 1363, 14 L.Ed.2d 281 (1965), or still remained in the courthouse under the court's control, Walton v. United States, 92 U.S.App.D.C. 26, 202 F.2d 18 (1953) ; Rowley v. Welch, *supra* note 28.

37. See Gilliam v. United States, *supra* note 28; Kennedy v. Reid, *supra* note 28; Clark v. Memolo, 85 U.S.App.D.C. 65, 67, 174 F.2d 978, 980 (1949) ; Rowley v. Welch, *supra* note 28.